IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID BRIGHTWELL

    v.                     :   Civil Action No. DKC 11-3278

GREGG L. HERSHBERGER, et al.

## MEMORANDUM OPINION

Presently pending and ready for resolution are: (1) a motion for summary judgment filed by Defendants former warden of Roxbury Correctional Institution Gregg L. Hershberger, Lt. Gary Winters, Sgt. James Stotler, C.O. II Roy Hess, C.O. II Marvin Gillespie, and C.O. II Chaz Younger ("Defendants") ; (2) a motion for leave to file a surreply by Plaintiff David Brightwell ("Plaintiff"); and (3) a motion for leave to file a supplemental brief in opposition to summary judgment by Plaintiff. (ECF Nos. 141; 172; 180). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendants' motion for summary judgment will be granted in part and denied in part; Plaintiff's motion for leave to file a surreply will be granted in part and denied in part; and Plaintiff's motion to file a supplemental brief will be denied.

## I.   Background

### A.   Factual Background[1]

Plaintiff has been an inmate in the Maryland prison system since 1997. (ECF No. 163-1 ¶ 2). In April 2009, he was moved to Roxbury Correctional Institution ("RCI"), where he was placed in Housing Unit 5. (*Id.* ¶ 4; ECF No. 163, at 7). According to Plaintiff, Housing Unit 5 was "an environment where correctional officers . . . were given virtually free reign . . . to harass inmates for no valid reason." (ECF No. 163, at 13). Plaintiff began having trouble with the correctional officers at RCI very soon after his arrival. As the result of a prior injury, Plaintiff has an arm injury that led the medical staff at his previous place of incarceration to issue an order that he should be handcuffed in front of his body on a permanent basis. (ECF No. 164-1, at 247). Plaintiff asserts that Defendants and other correctional officers at RCI refused to agree to cuff him in the front. Plaintiff refused to be cuffed from behind, and, in turn, the correctional officers would not allow him access to various activities that required him to leave his cell. (ECF Nos. 163-1 ¶ 22; 163-2 ¶¶ 4, 7). As a result of these interactions, Plaintiff filed complaints through the Administrative Remedy Procedure ("ARP") process with the Warden

---

[1] Unless otherwise noted, the facts outlined here are undisputed or construed in the light most favorable to Plaintiff.

2

of RCI, Defendant Hershberger.  (*See, e.g.*, ECF No. 164-1, at 104, 107, 115, 127, 251, 346, 370).  One of the first ARPs that Plaintiff filed after being transferred to RCI was against Defendant Winters on June 4, 2009, for informing him that he would have to be cuffed with his hands behind his back from now on.  (*Id.* at 251).

On October 1, 2009, Defendants attempted to move Plaintiff and another inmate into a shared cell.  (ECF No. 163-1 ¶ 29). Plaintiff had long-standing emotional issues, including paranoia, about being celled with another inmate.  (*Id.* ¶ 16). According to Plaintiff, when both he and the other inmate refused to cooperate during the transfer, several Defendants assaulted them.  (*Id.* ¶ 29; ECF No. 164-1, at 265-67). Defendants tell a markedly different story of the October 1 encounter.  They allege that Plaintiff attacked the other inmate while they attempted to transfer him into the cell and that any injuries sustained by Plaintiff were the result of fighting with the other inmate and their reasonable efforts to subdue the two fighting prisoners.  (ECF No. 141-1, at 7).  After the alleged assault, Plaintiff filed an ARP describing his version of the incident and suggesting that Defendant Winters was behind the transfer of the other inmate and, in turn, the assault, because of the numerous administrative complaints Plaintiff had filed, including, in particular, the one against Defendant Winters.

3

(ECF No. 164-1, at 265-67).   Even though Defendant Winters was mentioned in the complaint, it appears that Defendant Hershberger assigned Winters to investigate this ARP.   After interviewing Plaintiff and Defendant Gillespie, Defendant Winters found that there was "no merit to [Plaintiff's] claims" and recommended dismissal of the ARP.   (*Id.* at 260).

On October 16, Plaintiff was moved to a different cell in Housing Unit 5 where he was told he would have a cellmate. Plaintiff again stated that he would not share a cell.   (ECF No. 163-1 ¶ 33).   According to Plaintiff and his witnesses, Defendants dragged him up the stairs, put him into the new cell, and physically beat him.   (*Id.;* ECF No. 163-2 ¶ 8).   Plaintiff filed an ARP for this purported attack as well.   (ECF No. 164-1, at 298).   Apparently believing this ARP to be related to the October 1 incident, Defendant Hershberger dismissed this complaint as having been already addressed.   (*Id.*).   Plaintiff appealed this decision up to a hearing with an administrative law judge ("ALJ"), who, after distinguishing between the two incidents, ruled on the merits that Plaintiff's witnesses, "while supportive of [his version], did not offer convincing

testimony to bolster [his] rendition of events." (ECF No. 141-2, at 155-65).[2]

From that October until February 2011, Plaintiff continued to face a litany of smaller issues related to his refusal be cuffed behind his body. He filed numerous ARPs alleging missed haircuts, showers, lunches, and physical therapy sessions. (*See, e.g.*, ECF No. 164-1, at 104, 107, 115, 127, 251, 346, 370). In December 2010, Darnell Owens became Plaintiff's cellmate, and Plaintiff encouraged him to submit ARPs over various issues Mr. Owens had with the Housing Unit 5 correctional officers. (ECF No. 163-1 ¶¶ 41-42).[3] According to the cellmates, Defendants later offered a "truce" to them if they agreed to stop filing ARPs. (*Id.* ¶ 41; ECF No. 163-3 ¶ 4). But after hearing what they believed to be a beating in a cell near theirs, Plaintiff wrote notes on February 4, 2011, to Defendant Stotler and another Housing Unit 5 Sergeant "protesting" the beatings and saying, "[F]rom now on when you want to jump on any prisoner illegally, [then] come and beat and jump on me also. Let it be known, that if you all want to jump,

---

[2] The ALJ found it noteworthy that Plaintiff had filed a sick call slip on October 17 but had only mentioned normal pains, nothing to do with an assault. (ECF No. 141-2, at 163).

[3] The record indicates that Mr. Owens had not filed a single ARP prior to moving in with Plaintiff in December 2010, but thereafter filed four in his first month in Housing Unit 5. (ECF No. 164 ¶ 2).

beat, and kill a prisoner illegally [then] let it be me." (ECF No. 164-2, at 91-95).

Plaintiff avers that Defendants assaulted him for a third time the day after he delivered these notes. On February 5, Defendants stopped Plaintiff after his shower, pulled him into a cell, and assaulted him. (ECF No. 163-1 ¶¶ 46-47). Defendants deny that they attacked Plaintiff that day and contend that nothing unusual at all happened on February 5. (ECF No. 141-1, at 35).

### B. Procedural Background

Maryland's administrative remedy procedures are discussed in more detail in the exhaustion section below. After the alleged assault in February 2011, Plaintiff filed three administrative complaints. First, he sent a letter to the Internal Investigative Unit ("IIU"), an independent group that investigates employee misconduct. (ECF No. 164-2, at 127-29). Second, Plaintiff sent a grievance directly to the Inmate Grievance Office ("IGO"), the highest level of adjudicator available in the ARP process. (*Id.* at 135-36). The IGO dismissed his complaint for having not previously exhausted the lower levels of the ARP process. (*Id.*). Third, he filed an ARP about the incident. Because ARPs had to be received and signed by on-duty officers, who Plaintiff says refused to accept his ARPs, he mailed this ARP directly to Defendant Hershberger as

Warden.  (ECF No. 163-1 ¶ 52).  The ARP coordinator who eventually received the mailed complaint dismissed the ARP because it was not properly signed.  (ECF No. 164-2, at 139).  Plaintiff appealed this dismissal first to the second level of the ARP procedure, the Commissioner of Corrections - who affirmed the decision - then, up to the IGO - which decided to hold a hearing on the case in front on an ALJ.  (*Id.* at 138-153).  That hearing occurred on November 9, 2011, but Plaintiff's witnesses were not present when he arrived.  When the ALJ told Plaintiff that the institution would attempt to bring one of those witnesses, Mr. Owens, to the hearing, but that he had to present his case with or without the witnesses, Plaintiff refused to proceed.  (*Id.* at 193-201).

The next day, more than a month before the ALJ issued her opinion, Plaintiff, representing himself, filed the instant suit in federal court seeking damages and injunctive relief for violations of state tort law and 42 U.S.C. § 1983.  (ECF No. 1, at 4).  He filed his First Amended Complaint on December 21, 2011.  (ECF No. 6-1).  On February 26, 2013, this court granted Defendants' motion to dismiss in part, authorized the appointment of counsel for Plaintiff, and directed the newly-appointed counsel to file a Second Amended Complaint.  (ECF Nos.

69, at 11-16; 70).[4]   Plaintiff filed a Second Amended Complaint on July 15, 2013, asserting claims under (1) 42 U.S.C. § 1983 for violations of his First, Eighth, and Fourteenth Amendment rights; (2) the Maryland Constitution; and (3) state laws for battery, negligence, and intentional infliction of emotional distress.   (ECF No. 80).   In the Second Amended Complaint, Plaintiff alleged the October 1 and 16, 2009 assaults for the first time.   (*Id.* ¶¶ 11-17).   On October 23, 2015, after the close of discovery, Defendants filed the pending motion for summary judgment.   (ECF No. 141).   Plaintiff responded in opposition, and Defendant replied.   (ECF Nos. 163; 171).

---

[4] The parties dispute which "constitutional claims" from Plaintiff's Second Amended Complaint survived the prior motion to dismiss. (ECF Nos. 141-1, at 39-41; 163, at 55-56; 171, at 19). By "constitutional claims," the parties seem to be arguing over specific constitutional violations that would form the bases of Plaintiff's claims under 42 U.S.C. § 1983. Plaintiff concedes the court foreclosed any claims based on conditions of confinement, verbal abuse, and denial of medical care (*see* ECF No. 69, at 19), but argues that his claims based on retaliation in violation his First Amendment rights are new. (ECF No. 163, at 56). Plaintiff's First Amended Complaint suggested that Defendants retaliated against him by denying him showers after the February 2011 assault. (ECF No. 6-1 ¶ 28). Emphasizing that the alleged conduct did not "demonstrate any adversity" nor show that the conduct was "causally connected to the exercise of Plaintiff's protected rights," the court dismissed retaliation as a basis for a claim. (ECF No. 69, 16). Plaintiff now contends that the 2011 assault was a result of his repeated submission of numerous ARPs against the RCI correctional officers prior to February 5, 2011. (*Id.* ¶¶ 20-24). This retaliation argument, based on a different harm at a different time, was not part of the previous dismissal.

## C.   Non-dispositive Motions

### 1.   Motion for Leave to File a Surreply

After Defendants filed their reply, Plaintiff moved to file a surreply. (ECF No. 172). Under Local Rule 105.2(a), "[u]nless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." Although a district court has discretion to allow a surreply, surreplies are generally disfavored. *Chubb & Son v. C.C. Complete Servs., LLC*, 919 F.Supp.2d 666, 679 (D.Md. 2013). A surreply may be permitted "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citation omitted). By contrast, "[a] motion for leave to file a surreply may be denied when the matter addressed in the reply is not new." *Marshall v. Capital View Mut. Homes*, No. RWT-12-3109, 2013 WL 3353752, at *3 (D.Md. July 2, 2013) (citation omitted).

Plaintiff argues that a surreply is necessary to address Defendants' arguments with regard to judicial tolling, equitable tolling, and the exclusion of an affidavit by a previously unidentified prisoner, Shabazz Watkins, who witnessed a part the 2011 assault. (ECF No. 171, at 2). Plaintiff's first two arguments fail because both of these legal issues were raised by

9

Plaintiff himself in his opposition brief and were not new in Defendants' reply. (ECF No. 163, at 40-42).

Plaintiff's third reason is sufficient. Defendants argued in their reply brief that Mr. Watkins's affidavit should not be considered because Plaintiff did not name him as a witness in his interrogatories until he updated in February 2016, months after the close of discovery. (ECF No. 171, at 17-18). Defendants do not contest that they made this argument for the first time in their reply. Instead, they correctly point out that they could not have made this argument in their opening brief because they did not know or expect that Plaintiff would include a statement from a new witness that he obtained months after the close of discovery. (ECF No. 173, at 2). Because Plaintiff was unable to respond to this argument, Plaintiff's motion to file a surreply is granted with respect to these arguments.

### 2.   Motion to Supplement

On July 11, 2016, Plaintiff moved to file a supplemental brief. (ECF No. 180). He argues that his supplement is necessary because of (1) new deposition evidence taken from Defendant David Scott Miller after briefing was complete and (2) the June 6, 2016, decision by the Supreme Court of the United States in *Ross v. Blake*, 136 S.Ct. 1850 (2016). Neither

warrants supplemental briefing. (*Id.*).[5] First, Plaintiff asserts that the deposition testimony from Defendant Miller demonstrates that there is a dispute of fact "concerning Defendants' harassment of [Plaintiff], which was the basis for [Plaintiff's] administrative complaints." (ECF No. 180-1, at 5). Plaintiff emphasizes that motive is material (ECF No. 182, at 3), but the relevant motive on summary judgment is Defendants' motive for the putative assault, not Plaintiff's motive for filing ARPs. Second, as discussed below, *Ross* provides a framework for our analysis of whether Plaintiff exhausted his administrative remedies, but, as Defendants point out in their opposition to the supplemental brief, Plaintiff made all of the relevant substantive arguments in his opposition brief. (ECF No. 181, at 4). The motion is therefore denied.

## II. Motion for Summary Judgment

### A.   Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250

---

[5] Defendant Miller does not appear to be a party to this motion to dismiss (ECF No. 141, at 1), but Plaintiff argues that his testimony bears on the motion with regard to the other Defendants.

(1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 249.   In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322–23.   Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that

there is a genuine issue for trial. *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed.R.Civ.P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *Gough v. Calvert Cnty. Detention Ctr.*, No. DKC-15-3095, 2016 WL 3181797 at *3 (D.Md. June 8, 2016). Failure to exhaust administrative remedies is also an affirmative defense, *Jones v. Bock*, 549 U.S. 199, 216 (2007), and "[defendants] bear the burden of proving that [Plaintiff] had remedies available to him of which he failed to take advantage." *Blake v. Ross*, 787 F.3d 693, 697 (4th Cir. 2015) *vacated on other grounds Ross v. Blake*, 136 S.Ct. 1856 (2016). Thus, Plaintiff's claims will be dismissed on summary judgment only "if Defendants raise the affirmative defense and also prove that Plaintiff has failed to exhaust available remedies." *McMillan v. Caple*, No. CV DKC-15-1882, 2016 WL 4269054, at *5 (D. Md. Aug. 15, 2016).

**B.   Statute of Limitations**

Defendants first argue that Plaintiff's 2009 assault claims are time-barred. Plaintiff first included these claims in his Second Amended Complaint in July 2013. The applicable statute

of limitations for a § 1983 claim comes from the state's limitations period for personal injuries in a tort action, *Wilson v. Garcia*, 471 U.S. 261, 266-69, 276 (1985); *Nasim v. Warden, Md. House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995), which, in Maryland, is the general three-year statute of limitations, Md. Code Ann., Cts. & Jud. Proc. § 5-101; *Nasim*, 64 F.3d at 955.

Plaintiff admits that he first pled these assaults after the end of this limitations period, but argues that the claims are not barred because: (1) they relate back to his original complaint; (2) the statute of limitations should have been tolled while he pursued his administrative remedies; and (3) the court should apply equitable tolling to either the period between when Plaintiff moved for appointed counsel and when his current counsel was appointed (November 15, 2011, to May 14, 2013); or between when the court ordered appointment of counsel and when appointed counsel was assigned and able to submit the Second Amended Complaint (February 26, 2013, to July 15, 2013). (ECF No. 163, at 36).

### 1. Relation Back

The Federal Rules of Civil Procedure provide that an amendment can relate back to the date of the original pleading if the amendment "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out – or attempted to be

14

set out - in the original pleading." Fed.R.Civ.P. 15(c)(1)(B).
Courts will not allow a plaintiff to assert "a new ground for
relief supported by facts that differ in both time and type from
those the original pleading set forth." *Mayle v. Felix,* 545
U.S. 644, 650 (2005).   Instead, the new claim must share a
"factual nexus" with the claims in the original complaint, and
the original complaint must have put the defendants on notice of
the claim.   *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir.
1983).

Plaintiff suggests that the 2009 assaults are part of the
same "pattern of misconduct involving most of the same
defendants" and therefore meet Rule 15(c)'s standard.   (ECF No.
163, at 37).   This argument is not persuasive.   Courts have
rejected relation back for similar patterns of behavior in the
context of other torts.   *See Doe v. Salisbury Univ.*, 123
F.Supp.3d 748, 757-58 (D.Md. 2015) (citing *English Boiler &
Tube, Inc. v. W.C. Rouse & Son, Inc.*, 172 F.3d 862, No. 97-2397,
1999 WL 89125, at *1-3 (4th Cir. 1999) (unpublished table
decision) (holding that new defamatory statements were part of
the same "campaign to disparage [the plaintiff]" against a
business competitor but could not be added by relation back
because each act of defamation is a separate tort)).   As
Defendants point out, the new claims that shared a factual nexus
in *Grattan* were part of the same "ultimate wrong" that led the

plaintiff to bring his suit.  710 F.2d at 163; *see also Farb v. Fed. Kemper Life Assur. Co.*, 213 F.R.D. 264, 267-68 (D.Md. 2003) (holding that an amended insurance claim would relate back where a plaintiff alleged the same entitlement to the proceeds of a single insurance policy under a different theory).  Here, Plaintiff has presented two new claims with all new facts that are equivalent to the 2011 assault.  These alleged assaults occurred more than sixteen months prior to the 2011 assault and by different sets of correctional officers.  (ECF Nos. 141-1, at 20; 171, at 4).  Relation back in a case like this would "leave the statute of limitations open-ended for additional acts . . . even though these acts involved different parties on different dates." *English Boiler & Tube*, 1999 WL 89125, at *3.

### 2.  Tolling

Plaintiff's tolling arguments also fail.  As Defendants point out, even if the court accepted Plaintiff's judicial tolling argument, he would not be within the limitations period unless the court equitably tolled the period for an additional two months.  To receive equitable tolling, a plaintiff bears the burden of showing "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649.  Plaintiff cites to a single case, *White v. Cooper*, 55 F.Supp.2d 848 (N.D.Ill. 1999), to argue that the statute of

16

limitations should be equitably tolled to cover either the full period between when he requested appointment of counsel on November 15, 2011, and when his current counsel was appointed on May 14, 2013, or, alternatively, the period between when counsel appointment was ordered on February 26, 2013, and when counsel was required to file the Second Amended Complaint on July 15 of that year. (ECF No. 163, at 41-42). In *White*, the court opined that prior to the appointment of counsel, the inmate plaintiff, who did not know the identity of his assailants, "was at a particular disadvantage" in trying to uncover the identities of the unknown tortfeasors without the help of pretrial discovery. 55 F.Supp.2d at 856. Because he had made reasonable efforts to discover these identities on his own, the court found that the lack of counsel qualified as extraordinary circumstances and allowed him to amend his complaint to add new defendants. *Id.* at 856-57. Plaintiff's Second Amended Complaint seeks to add new claims, not new defendants. Unlike the plaintiff in *White*, Plaintiff cannot tie his lack of counsel to his failure to assert these 2009 assault claims. Put another way, Plaintiff knew he had been assaulted in 2009, but he offers no explanation as to why his lack of counsel prevented him from including these assaults when he filed his original complaint. Indeed, Plaintiff admitted that he was aware that he could sue based on the 2009 assaults and simply let Defendants "slide" before he

17

"got tired" of the problems in 2011.  (ECF No. 141-2, at 51).
Plaintiff has thus failed to show that his lack of counsel
constitutes an extraordinary circumstance that stood in the way
of his timely filing of these claims, and the limitations period
will not be tolled.[6]

Plaintiff's assault claims based on the October 1 and
October 16, 2009 incidents are therefore time-barred.  The
motion for summary judgment will be granted for these claims.

### C.   Administrative Exhaustion

Defendants next claim that Plaintiff failed to exhaust his
administrative remedies as a defense to Plaintiff's claims based
on the 2011 assault.  The Prisoner Litigation Reform Act
("PLRA") provides, in pertinent part, "No action shall be
brought with respect to prison conditions under section 1983 of
this title, or any other Federal law, by a prisoner confined in
any jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted."  42
U.S.C. § 1997e.  Exhaustion under the PLRA is mandatory, and
courts may not excuse a failure to exhaust "irrespective of any
'special circumstances.'"  *Ross*, 136 S.Ct. at 1856.  Exhaustion
is a precondition to filing suit, and exhausting administrative

---

[6]   Equitable tolling also requires an examination of the
diligent pursuit of legal rights.  *Holland*, 560 U.S. at 649.
Plaintiff letting Defendants "slide" on the 2009 assaults
similarly shows a lack of diligence.  (ECF No. 141-2, at 51).

remedies after a complaint is filed will not prevent a case from being dismissed for failure to exhaust. *Kitchen v. Ickes*, 116 F.Supp.3d 613, 624–25 (D.Md. 2015).

The only limitation on the PLRA's exhaustion requirement is that the remedy must be "available." 42 U.S.C. § 1997e. Being "available" requires both that the remedial procedure exist in law and that, in actual practice, it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S.Ct. at 1859 (citing *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The Supreme Court has articulated three circumstances in which an administrative remedy is not "available" despite being officially on the books:  (1) when the process operates as a "simple dead end" with no actual possibility of relief to prisoners; (2) when the process is so opaque or confusing that it is "essentially 'unknowable' – so that no ordinary prisoner can make sense of what it demands;" and (3) when prison officials thwart inmates from using the process through machination, misrepresentation, or intimidation. *Id.* at 1859–60.

In Maryland, prisoners can bring a complaint against a correctional officer through three administrative paths. The primary method is the ARP. Department of Correction ("DOC") directives provide that prisoners may use the ARP process for most types of grievances, including those relating to the use of

force.   (ECF No. 164-1, at 144).   A prisoner begins the ARP process by filing a request for an administrative remedy with the Warden of the prison in which he is incarcerated.   If his request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction.   If this appeal is denied, the prisoner then has thirty days in which to file an appeal to the Executive Director of the IGO.   *See* Md. Code Ann., Corr. Serv. §§ 10-206, 10-210; Md. Code Regs. 12.07.01.03.   The second path under Maryland law allows a prisoner to file a grievance directly with the IGO in some cases.   *See* Md. Code Ann., Corr. Servs. § 10-206(a).   The third administrative process that a prisoner may pursue is an investigation of the incident by the IIU.   *See* Md. Code Regs. 12.11.01.09(E).   The IIU oversees disciplinary investigations into allegations of employee misconduct, including the use of excessive force.   Md. Code Regs. 12.11.01.05(A)(3).   Although a prisoner may file a complaint with the IIU, the IIU does not have authority to provide any relief to the prisoner himself.   Md. Code Regs. 12.11.01.09(E); 12.11.01.04.

The relationship among these various paths to relief is complicated.   For example, a prisoner may file a request for relief directly with the IGO, but the IGO has issued a regulation requiring inmates to use the standard ARP process if that process is available to a grievant in a particular

situation or occurrence.   Md. Code Regs. 12.07.01.02D.[7]   The availability of one process thus closes the door to another. Similarly, according to DOC directives, a warden receiving an ARP complaint must dismiss the complaint when he "determine[s] that the basis of the complaint is the same basis of an investigation under the authority of the [IIU]."  (ECF No. 164-1, at 9 (citing DCD 185-003)).   The complexity of the interactions among these three processes led the Supreme Court to question whether prisoners in Maryland truly had "available" remedies under the PLRA in a recent decision.  *Ross*, 136 S.Ct. at 1860-62.

Here, Defendants contend that Plaintiff failed to exhaust his administrative remedies in two ways.  First, by refusing to participate in his November 9 hearing in front of the IGO, he failed to "us[e] all steps that the agency holds out, and do[] so *properly* (so that the agency addresses the issues on the merits)."  (ECF No. 141-1, at 20 (citing *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006))).   Second, Defendants assert that Plaintiff "jumped the gun" by filing his federal suit the day after the hearing on November 10 because the ALJ had not yet issued her final determination.  (ECF No. 141-1, at 21).  Both of Defendants' arguments stemming from the November 9 hearing

---

[7] The IGO may require prisoners to exhaust other procedures where the procedures are (1) applicable to the grievance and (2) "reasonable and fair."  Md. Code Ann., Corr. Servs. § 10-206(b).

rest on the notion that Plaintiff still had administrative remedies available to him at that hearing.   Plaintiff counters, *inter alia*, that opening the IIU investigation foreclosed the ARP process, and, therefore, he had no further remedies that were actually available on November 9.   (ECF No. 163, at 38-40).

Defendants try to undermine Plaintiff's IIU theory in two ways.   First, they cite to *Blake v. Maynard*, No. 09-02367-AW, 2012 WL 1664107 (D.Md. May 10, 2012) *rev'd sub nom. Blake v. Ross*, 787 F.3d 693 (4th Cir. 2015), *vacated,* 136 S.Ct. 1850, in support of the proposition that a Plaintiff whose complaint is subject to an IIU investigation loses his ability to file an ARP complaint, but must still file a grievance directly with the IGO.   (ECF No. 141-1, at 27-28).   The court in *Blake v. Maynard* said as much:

> In short, notwithstanding their interrelation, the IGO grievance procedure is at once legally and practically distinct from the ARP process. . . . True, the ARP process does not apply to complaints with 'the same basis as an investigation under the authority of the . . . IIU.' In other words, if the IIU is investigating an incident with the same factual underpinning as a prisoner's complaint, the prisoner may not submit the complaint to the ARP process, including appeals to the Commissioner. . . . The DOC's directives do not, however, spare prisoners from satisfying the IGO grievance process. . . . Nor could the DOC's directives excuse prisoners from exhausting the IGO grievance process in this case's circumstances.   As outlined above, Maryland law vests primary responsibility of fielding

> inmate grievances with the IGO.  The IGO, in
> turn, has issued a regulation requiring
> grievants to properly exhaust the ARP only
> if the ARP applies to a particular situation
> or occurrence.  Here, in view of DCD 185-
> 003.VI.N.4, the ARP does not apply to
> Blake's complaint.  As a result, the IGO
> grievance process applies to Blake's
> complaint.

2012 WL 1664107 at *5-6 (internal citations omitted).  Both the United States Court of Appeals for the Fourth Circuit and the Supreme Court, however, have called this holding into question on appeal.  *Ross*, 136 S.Ct. at 1860 ("The facts of this case raise questions about whether, given these principles, Blake had an 'available' administrative remedy to exhaust."); *Blake*, 787 F.3d at 698 (holding that the plaintiff was not required to exhaust his remedies, in part because he was "justified" in believing that he had exhausted administrative remedies "because the prison's remedial system was confusing").  That holding also contradicted the decisions of several other judges in this district that an IIU investigation fully satisfies the exhaustion requirement.  *See Kitchen*, 116 F.Supp.3d at 625 ("The court is aware that once a claim of excessive force is referred to IIU[,] no further administrative remedy proceedings may occur."); *see also Shiheed v. Shaffer*, No. GLR-14-1351, 2015 WL 4984505, at *3 (D.Md. Aug. 18, 2015); *Manzur v. Daney*, No. PWG-14-2268, 2015 WL 1962182, at *3 (D.Md. Apr. 29, 2015); *Chew v. Green*, No. DKC-13-2115, 2014 WL 4384259, at *13 (D.Md. Sept. 2,

2014); *Henderson v. Simpkins*, No. CCB-13-1421, 2014 WL 3698878, at *6 (D.Md. July 24, 2014); *Bogues v. McAlpine*, No. CCB-11-463, 2011 WL 5974634, at *4 (D.Md. Nov. 28, 2011); *Williams v. Shearin*, No. L-10-1479, 2010 WL 5137820, at *2 n.2 (D.Md. Dec. 10, 2010); *Thomas v. Bell*, No. AW-08-2156, 2010 WL 2779308, at *4 (D.Md. July 7, 2010). Because there may be some number of cases in which the IGO would hear grievances but the ARP process would not apply, *see Ross*, 136 S.Ct. at 1860, it is possible that an IIU investigation, which prevents further proceedings "within the ARP process," would not exhaust a prisoner's remedies in all cases. Because Plaintiff's complaint would have been subject to the ARP process absent the IIU investigation here, however, this is not such a case.

Second, Defendants assert that the IIU does not fully cut off the ARP process. (ECF No. 141-1, at 26). Rather, they suggest, because the procedural dismissal of an ARP complaint based on the IIU investigation that is required under DCD 185-003 can be appealed by the inmate, the procedural dismissal does not meet the exhaustion requirement until the completion of the appeals process. This argument runs counter to all of the decisions cited above, including *Blake v. Maynard*, and common sense. Where the relevant administrative rules provide clear grounds for a procedural dismissal of the complaint, it seems disingenuous to suggest that a prisoner ought to appeal such a

dismissal even if he knows it was rightly decided and has no legal or factual arguments that the complaint was inappropriately dismissed. At best, this process would be "so confusing that . . . no reasonable prisoner can use [it]." *Ross*, 136 S.Ct. at 1859. At worst, this is the type of "game-playing" that "thwarts the effective invocation of the administrative process." *Id*. at 1862. In either case, Plaintiff has established that such an administrative remedy was not "available" to him.

Defendants make a last ditch effort to argue that because Plaintiff attempted to pursue the IGO and ARP processes, received the November 9 hearing, and refused to participate in it, he has failed to exhaust. (ECF No. 141-1, at 24-26). Plaintiff, they say, went forward with the IGO and ARP processes because he knew that he had not exhausted his remedies. Defendants present no cases suggesting that an inmate who has legally exhausted his administrative remedies has the ability to undo his exhaustion by way of other attempts at relief. Even if Plaintiff believed that he had to go through the ARP or IGO grievance processes, his subjective belief about whether he had or had not exhausted his remedies does not bear on whether he has successfully done so. *See Ross*, 136 S.Ct. at 1858 (emphasizing that the PLRA's strict standards take no account of whether "a prisoner makes a reasonable mistake about the meaning

of a prison's grievance procedures"). If anything, the fact that Plaintiff continued to pursue the ARP process demonstrates how confusing Maryland's procedures are. Because the existence of an IIU investigation shuts down the ARP process and thus exhausts administrative remedies for complaints that would typically fall within the ARP jurisdiction, Plaintiff met his burden to exhaust upon the initiation of that investigation.[8] Therefore, Defendants' exhaustion defense fails.

**D.  Merits**

**1.  Supervisory Liability for Defendants Hershberger and Winters**

Defendants next seek summary judgment on Plaintiff's claims against Defendants Hershberger and Winters ("Supervising Defendants"). Plaintiff argues that these Defendants are liable under a theory of supervisory liability. To establish supervisory liability in a § 1983 action, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinates were engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to

---

[8] Although the parties do not argue as much, the court recognizes that there might be policy concerns that prisoners could bypass the normal administrative processes by filing for an IIU complaint and immediately filing in federal court. To the extent that this is possible, it is dependent on the current directive that *dismisses* other administrative actions when subject matter is the same. If, for example, the administrative proceedings were stayed pending an IIU investigation, no such problem would exist.

citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to demonstrate "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks and citations omitted). The first element has three sub-parts: (a) the supervisor's knowledge of (b) conduct engaged in by a subordinate (c) where the conduct poses "a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.* Establishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread or has occurred on several different occasions. *Id.*

Plaintiff asserts that the "plethora of ARPs" submitted into evidence that he filed between June 2009 and May 2011 creates a dispute of fact over whether Supervising Defendants had knowledge of the risk that their employees posed to him. As Defendants point out, these ARPs were almost all related to relatively minor issues – missed showers and haircuts, skipped lunches, allegedly improper write-ups of Plaintiff for rule violation, refusal to sign other ARPs, and skipped or rescheduled back therapy sessions – that would not establish a risk of constitutional injury. These ARPs, viewed cumulatively,

might show pervasive *disagreement* between Plaintiff and the other Defendants but would not give Supervising Defendants actual or constructive notice that the complained of employees might be creating a pervasive and unreasonable risk of an *assault*. Plaintiff's prior assault ARP might have provided such notice, but the Fourth Circuit has made clear that a plaintiff "assumes a heavy burden of proof in establishing deliberate indifference" that cannot be satisfied "by pointing to a single incident or isolated incidents." *Id.* Plaintiff has not produced any evidence supporting his assertion that the correctional officers in Housing Unit 5 were habitually abusive in a way that would provide actual or constructive knowledge to Supervising Defendants. The motion for summary judgment is therefore granted with respect to supervisory liability of Defendants Hershberger and Winters.

**2. Plaintiff's 2011 Claims Against Defendants Stotler, Hess, Gillespie, and Younger.**

Finally, Defendants move for summary judgment in favor of all Defendants who purportedly committed the 2011 assault. Although Plaintiff and Defendants certainly dispute the material facts in this case, Defendants argue that no reasonable jury would return a verdict in Plaintiff's favor. (ECF No. 141-1, at 35). On a motion for summary judgment, "[i]t is the affirmative obligation of the trial judge to prevent factually unsupported

claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citing *Celotex*, 477 U.S> at 323-24).   The inquiry is "not whether [the judge] thinks that the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," the court need not put the case to a trier of fact. *Scott v. Harris*, 550 U.S. 372, 380 (2007).   The evidence supporting Plaintiff's version of events includes his own statements in the proceedings he filed after the purported assault, a declaration from Mr. Owens, a declaration from Mr. Watkins, testimony from his medical experts, and the IIU investigation report, which includes references to his injuries and apparent corroboration of his story by inmate Brian McKenzie. (*See* ECF Nos. 164-2, at 131-140, 229; 163-3; 163-4; 141-2, at 94, 106).

Defendants contend that the record contradicts Plaintiff's version of the February 5 events in a number of ways.   First, they suggest that Plaintiff's knee injuries were preexisting injuries that were a result of kneeling while praying.   Second, although Plaintiff avers that five different correctional officers punched, kicked, and stomped him, the IIU investigator

noted relatively minor injuries. (ECF No. 141-2, at 88, 93).
Third, they argue that Mr. Owens' affidavit (and presumably the
statement from Mr. McKenzie) should be disbelieved because the
IIU investigator found them not credible. Fourth, they contend
that if a beating occurred, other inmates would have reported
it. Finally, Defendants suggest that the court should not
consider Mr. Watkins's affidavit because Plaintiff did not take
the affidavit or submit it to the record until months after the
close of discovery.

The parties present significant evidence regarding
Plaintiff's knee injuries. The nurse who saw Plaintiff on
February 7 said that his knee injury appeared to be more than 48
hours old. (ECF No. 141-2, at 94). They point out that
Plaintiff had previously complained of knee issues in 2002,
2003, and 2005. (ECF No. 141-2, at 108-110). One of the
doctors reviewing Plaintiff's knee complaints and the statements
of the other medical experts considered the knee injury to be a
result of frequent kneeling to pray and not the result of a
trauma. (*Id.* at 110, 188). Plaintiff has produced counter
evidence from his own physician who lamented the lack of good
treatment records, but concluded that Plaintiff suffered an
"internal derangement to his left knee on or about 02/05/2011 as
a result of an assault." (*Id.* at 106). An independent medical
examiner also concluded that Plaintiff had an internal

30

derangement in the knee.  (ECF No. 164-2, at 229).  Moreover, in arguing that Plaintiff's injuries were not consistent with a beating at the hands of five correctional officers, Defendants cite to medical expert's statement that Plaintiff's knee injury was only 3cm, but that 3cm evaluation came on February 21, sixteen days after the alleged injury.  (ECF No. 141-2, at 185). On February 7, the attending nurse referred to the knee injury as a "large scabbed area." (*Id.* at 94).

With regard to the seriousness of Plaintiff's other injuries, Defendants place too much weight on the IIU investigator's determinations.  As Plaintiff points out, the investigator has no medical expertise upon which to evaluate the relationship between Plaintiff's injuries and his version of the events.  (ECF No. 163, at 54).  Although the IIU investigator suggested his injuries should have been more substantial, it had been two days since the alleged assault.  At least some evidence supports Plaintiff's claim.  The same nurse who said Plaintiff's knee injury appeared more than 48 hours old said that the bruises on his arm, cut inside his lip, and scratches on his hands appeared to be 48 hours old.  (ECF No. 141-2, at 94).

Defendants similarly rely on the IIU investigation to rebut the affidavits of other witnesses.  The IIU investigator said that Plaintiff's story was not credible despite being supported by both Mr. Owens and Mr. McKenzie.  (*Id.* at 88-89).  Such

31

credibility determinations are reserved for fact finders in judicial proceedings, and it would be especially strange here to reject the content of Mr. Owens written affidavit simply because the IIU investigator found that he lacked credibility in an oral interview years earlier, the details of which are sparsely recorded.  Defendants' argument that the record would show ARPs by other inmates if there had been an assault is also unpersuasive.  They have produced no evidence suggesting that assaults typically result in ARPs by third-party inmates, and Plaintiff has produced statements that, if deemed credible, suggest that Defendants actively attempted to dissuade prisoners from filing ARPs.

Finally, Defendants argue that the Watkins Affidavit should not be considered because Plaintiff did not identify Mr. Watkins as a witness until his Response in Opposition to this motion in February 2016, seven months after the close of discovery.  (ECF No. 171, at 17).  Under Fed.R.Civ.P. 26(e)(1)(A), parties have a duty to update responses to interrogatories in a timely manner. Defendants point out that Mr. Watkins's affidavit is signed and dated December 31, 2015, but that Plaintiff did not supplement his interrogatory to notify them about Mr. Watkins until two months later.  (ECF No. 171, at 17-18).  In his surreply, Plaintiff argues that he previously responded to Defendants' interrogatory regarding witnesses by noting that "other,

unidentified inmates on level 2 of C-Tier may have witnessed all or part of the incident." (ECF No. 172-1, at 4, 10).  He also emphasized that this information was otherwise available to Defendants, as he was able to find Mr. Watkins as a result of information that they produced to him on March 20, 2015, identifying the other inmates on level 2 of C-Tier on the date of the purported assault. (ECF Nos. 173, at 2; 175, at 2). Because Defendants were aware that Mr. Watkins might have witnessed the incident, the court will not exclude Mr. Watkins's statement.

Defendants have not demonstrated that Plaintiff's evidence is so blatantly contradicted by the record that no reasonable jury could return a verdict in Plaintiff's favor. Accordingly, the motion for summary judgment fails.

## III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted in part and denied in part; Plaintiff's motion for leave to file a surreply will be granted in part and denied in part; and Plaintiff's motion to file a supplemental brief will be denied.  A separate order will follow.


                                    /s/
                          _____
                          DEBORAH K. CHASANOW
                          United States District Judge